2026-1471

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**ENTROPIC COMMUNICATIONS, LLC,**
*Appellant*,

v.

**JOHN A. SQUIRES, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,**
*Intervenor.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2024-00430.

# BRIEF FOR DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

AUSTIN P. MAYRON
Deputy Solicitor

ROBERT J. MCMANUS
Senior IP Legal Counsel

KEVIN K. MCNISH
Senior Counsel for Patent Law and Litigation

PETER J. SAWERT
OMAR F. AMIN
Associate Solicitors

U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

September 30, 2026

*Attorneys for the Director of the U.S. Patent and Trademark Office*

## ILLUSTRATIVE CLAIMS

1. [1PRE] A method comprising:

   [1A] receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a *probe*, wherein the first plurality of parameters at least *specify* content payload of the *probe* and a second node;

   [1B] determining a second plurality of parameters associated with generation and transmission of the probe;

   [1C] generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and

   [1D] transmitting the probe from the first node to the second node.

9. [9PRE] A method comprising:

   [9A] a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer *probe*, the first plurality of probe parameters comprising a form for the *probe* including a modulation profile for the *probe*;

   [9B] the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.

Appx109 (13:45-58, 14:18-28) (emphases added) (annotations as per Board's Decision at Appx10-11).

# TABLE OF CONTENTS


I. STATEMENT OF THE ISSUES .......... 1

II. STATEMENT OF THE CASE .......... 2

A. The ’690 Patent .......... 4

B. The Prior Art .......... 8

1. WiMAX .......... 8
2. DOCSIS 2.0 .......... 11

C. The Board Decision .......... 12

III. SUMMARY OF THE ARGUMENT .......... 16

IV. STANDARD OF REVIEW .......... 18

V. ARGUMENT .......... 19

A. The Board correctly rejected Entropic’s attempt to use examples from the specification to import limitations into the construction of “probe.” .......... 19

1. The Board’s rejection of Entropic’s narrowing claim construction was correct in view of the intrinsic record .......... 20
2. The Board correctly concluded that it was not necessary to consider extrinsic evidence because the intrinsic record is clear. .......... 26

B. After rejecting Entropic’s construction of “probe,” the Board correctly concluded that the plain and ordinary meaning of “probe” was sufficient to decide the remaining issues. .......... 28

C. Substantial evidence supports the Board’s finding that WiMAX teaches the “specify” limitation of claim 1 .......... 33

VI. CONCLUSION .......... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 31

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 18

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002) .......... 19, 24

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) .......... 32

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 18

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016) .......... 33

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) .......... 18

*Kaken Pharm. Co., Ltd. v. Iancu*,
952 F.3d 1346 (Fed. Cir. 2020) .......... 28

*Knowles Elecs. LLC v. Cirrus Logic, Inc.*,
883 F.3d 1358 (Fed. Cir. 2018) .......... 18

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......... 24

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,
868 F.3d 1013 (Fed. Cir. 2017) .......... 30

*In re Nuvasive*,
842 F.3d 1376 (Fed. Cir. 2016) .......... 31, 32

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......... 20, 24, 26

*Polaris Innovations Ltd. v. Brent*,
48 F.4th 1365 (Fed. Cir. 2022) .......... 19

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) .......... 31

*Realtime Data, LLC v. Iancu*,
912 F.3d 1368 (Fed. Cir. 2019) .......... 30

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
130 F.4th 1372 (Fed. Cir. 2025) .......... 26

*In re Sang-Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .......... 31, 32

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) .......... 26

*Securus Techs., Inc. v. Global Tel*Link Corp.*,
685 F. App'x 979 (Fed. Cir. 2017) .......... 32

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) .......... 18

*In re Urbanski*,
809 F.3d 1237 (Fed. Cir. 2016) .......... 19, 36

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) .......... 30

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) .......... 18

**Statutes**

5 U.S.C. § 706(2)(E) .......... 18

## STATEMENT OF RELATED CASES

The Director is aware of the related matters identified by Entropic in its Statement of Related Cases. The Director is unaware of any other appeal in connection with the patent at issue in this case that was previously before this or any other court. The Director is not aware of any additional cases that are pending in this or any other court that will directly affect, or directly be affected by, the Court's decision in this appeal.

# I. STATEMENT OF THE ISSUES

This appeal relates to an inter partes review (IPR) of U.S. Patent No. 8,284,690 ("the '690 patent") owned by Appellant Entropic Communications, LLC ("Entropic"). The '690 patent broadly relates to a method for a network device ("node") to generate a "probe" transmission in response to a "probe request" from another network device (separate "node"). The Patent Trial and Appeal Board ("Board") determined that claims 1-3, 6-10, 14-18, and 22-24 of the '690 patent are anticipated by and/or would have been obvious to one of ordinary skill in the art at the time of invention in view of WiMAX, DOCSIS-2.0, and other prior art.

The issues are:

(1) whether the Board correctly construed the term "probe" in the claims;

(2) for claims 1-3, 6-8, 10, 14-18, and 22-24, whether substantial evidence supports the Board's findings that WiMAX and DOCSIS-2.0 each teach the claimed "probe;" and

(3) for claims 1-3 and 6-8, whether substantial evidence supports the Board's finding that WiMAX teaches the "specify content payload of the probe" limitation.

## II. STATEMENT OF THE CASE

The Board instituted trial (IPR2024-00430) based on a Petition for IPR filed by Comcast Cable Communications, LLC ("Petitioner" or "Comcast"). The Board's Final Written Decision determined that Comcast had shown that claims 1-3, 6-10, 14-18, and 22-24 of the '690 patent are unpatentable as anticipated by and/or obvious over various combinations of prior art. Appx1-82. Specifically, the Board determined that claims 1-3, 6, 7, 9, 14, and 15 are anticipated by WiMAX;[1] that claims 3, 17, 22 and 23 would have been obvious in view of WiMAX; that claims 8, 16, and 24 would have been obvious over WiMAX and Won; that claim 9 is anticipated by and would have been obvious over Waxman; that claim 9 is anticipated by DOCSIS-2.0; that claim 9 would have been obvious over DOCSIS-2.0 and ISO8802-2; and that claims 10, 17, and 18 would have been obvious over DOCSIS-2.0 and Zuckerman alone, or in further combination with ISO8802-2. *Id.*

Comcast's subsequent request for rehearing was granted in part, but the Board's rehearing decision did not affect any of the Board's unpatentability determinations. Appx83-95. This appeal followed. The Director intervened to

[1] The Board's Decision refers to this prior art reference as IEEE-802.16. *See, e.g.*, Appx26, Appx80. Entropic's Opening Brief calls this reference WiMAX. The Director thus uses WiMAX for the Court's ease of cross-referencing the briefing.

defend the Board's Decision following Comcast's notice that, pursuant to a settlement agreement, it would not participate in the appeal. ECF Nos. 2, 7, 9.

On appeal, Entropic challenges the Board's determinations related to only two of the prior art references: WiMAX (IEEE-802.16) and DOCSIS-2.0. The Board's determinations about Won, Waxman, ISO8802-2, and Zuckerman are not at issue in this appeal. Appx80. Claim 9 is also not at issue because Entropic does not challenge the Board's determinations that Waxman both anticipates and renders obvious claim 9. Appx58, Appx60. However, Entropic has challenged the Board's determinations that claims 10 and 14-16, which all depend directly or indirectly from claim 9, are unpatentable. Thus, the construction of "probe" in claim 9 remains relevant as to those dependent claims.

### A. The ’690 Patent

The ’690 patent discloses a method and apparatus in which “nodes on a network (also referred to as network devices) are programmed to generate a probe transmission in response to a request from nodes that will be receiving the probe.” Appx103 (1:66-2:3). The ’690 patent states that “these receiver determined probes may be used in a variety of applications,” including, for example: (1) “to reach or discover hidden nodes”; (2) “for OFDMA sub-channel assessment;”[2] or (3) “for off-site network diagnosis” by content providers. *Id.* (2:20-27). As further examples of the “variety of applications” for probes, the ’690 patent states that “network probes are used to perform various channel assessment or network maintenance procedures” and that “a probe can replicate a potential problem, reach or discover a distant or previously undetected node on the network, or assist with network admissions procedures.” Appx103 (2:20-21); Appx104 (4:25-27, 35-38).

[2] OFDMA stands for orthogonal frequency division multiple access. Appx103 (2:23-24). “OFDMA may be employed to allow multiple nodes to have simultaneous access to the [network] channel.” Appx104 (4:65-66).

Referring to Figure 1 (below), the '690 patent discloses examples of nodes associated with computers **109** and **110**, television **111**, and media device **103**, all of which are connected to communications medium (e.g., coaxial network) **100** within residence **101**. Appx104 (3:27-28, 33-35; 4:10-20). Another possible node is one that interfaces to an internet or cable services provider **112**. *Id.* (4:20-24).




*Fig. 1*

Fig. 1 of the '690 Patent (Appx97)

The ’690 patent describes a method for generating a network probe with reference to Figure 4 (below). Appx105 (6:17-18).




Fig. 4 of the ’690 Patent (Appx100)

The ’690 patent states that at step **200** a network node (the requesting node) transmits a probe request—possibly including some parameters for the probe transmission to be sent. Appx105 (6:18-32, 34-36). At step **201**, the probe request is received by a network node (i.e., “the probe transmitter”), and, at step **202**, “the probe transmitter uses the specified probe parameters to generate a probe . . . that

complies with the specified parameters." *Id.* (6:33-34, 38-40). At step **203**, the probe transmitter transmits the generated probe. *Id.* (6:40-42). At step **204**, the requesting node receives the probe and may process the probe at step **205**. *Id.* (6:57-59). Later, the '690 patent describes some examples of parameters (e.g., data sequence or transmission power) that could be included in a probe request. Appx106-107 (7:29-10:2); Appx101 (Fig. 5).

The '690 patent states that, for the disclosed method and apparatus, "some embodiments relate to channel assessment probes." Appx103 (1:12-14). For this use, the '690 patent explains that the receiving node requests transmission of a "well defined" probe. *Id.* (1:48-54). "By comparing the reference probe with the actual received probe, the receiver can determine some of the characteristics of the channel between the transmitting and receiving node." *Id.* (1:54-57).

Claims 1 and 9 are illustrative:

1. [1PRE] A method comprising:

   [1A] receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a *probe*, wherein the first plurality of parameters at least specify content payload of the *probe* and a second node;

   [1B] determining a second plurality of parameters associated with generation and transmission of the *probe*;

   [1C] generating the *probe* in accordance with the first plurality of parameters and the second plurality of parameters, wherein the *probe* has a form dictated by the first plurality of parameters; and

   [1D] transmitting the *probe* from the first node to the second node.

9. [9PRE] A method comprising:

[9A] a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer *probe*, the first plurality of probe parameters comprising a form for the *probe* including a modulation profile for the *probe*;

[9B] the first node receiving the probe from the second node, wherein the probe is generated in accordance with the first plurality of parameters and in accordance with a second plurality of parameters determined by the second node.

Appx109 (13:45-58, 14:18-28) (emphases added) (annotations as per Board's Decision at Appx10-11).

### B. The Prior Art

#### 1. WiMAX

WiMAX[3] is an IEEE standard defining "the air interface of fixed broadband wireless access (BWA) systems supporting multimedia services." Appx3669. WiMAX teaches that compliant BWA systems "shall support the applicable procedures for entering and registering a new SS [subscriber station] or a new node to the network." Appx3868; Appx3712; Appx3716. For point-to-multipoint (PMP) implementations, subscriber stations are connected to the network via base stations (BS). Appx3868-3869; Appx3708; Appx3714; Appx3716.[4]

---

[3] IEEE 802.16 Standard for Local and metropolitan area networks, Part 16: Air Interface for Fixed Broadband Wireless Access Systems (Oct. 1, 2004) ("WiMAX"). Appx3664-4558.

[4] WiMAX also teaches an optional "Mesh" implementation that allows communications to "be routed through other SSs and . . . directly between SSs,"

Exchanges between peer entities (e.g., BS and SS) are defined by a protocol data unit (PDU). Appx3710. Defining the protocol for BS and SS communication, WiMAX first teaches that PDUs—for the medium access control (MAC) networking layer—include a Generic MAC header and an optional Payload. Appx3736 (¶ 6.3.2; Fig. 18). The next to last field in a Generic MAC header is a connection identifier (CID). Appx3737 (Table 4; Fig. 19); Appx3708; Appx3714. A CID is a numeric (16-bit) label for a connection between a specific SS and BS. Appx3734; Appx3708. At least two unique CIDs are assigned for different priority level messages (Basic and Primary) between the BS and each SS during initialization of the connection. Appx3734.

Continuing to define the BS and SS communication protocol, WiMAX next teaches that the Payload of a MAC PDU may include "MAC Management messages." Appx3743. Two examples of MAC Management messages that can be included in a PDU's Payload are a Ranging Request (RNG-REQ) and a Ranging Response (RNG-RSP). Appx3744 (Table 14). "Ranging is the process of acquiring the correct timing offset and power adjustments such that the SS's transmissions" are properly received by the BS. Appx3875 (¶ 6.3.9.5). For PMP

---

not just "between the BS and SSs" as in PMP mode. Appx3733. In "Mesh" mode, the members of the network are thus referred to more generically as "nodes." *Id.*; *see also* Appx3710 (¶ 3.32).

operation, the third phase in connecting a new SS to the network via a BS is to "[p]erform ranging." Appx3868. "Following initial ranging, periodic ranging allows the SS to adjust transmission parameters so that the SS can maintain uplink communications with the BS." Appx3903 (¶ 6.3.10.2); *see also* Appx4178 (¶ 8.3.7.2).

To carry out the ranging process, WiMAX teaches that a ranging request (RNG-REQ) message "shall be transmitted by the SS at initialization and periodically to determine network delay and to request power and/or downlink burst profile change." Appx3750. In the ranging request message for initialization, the CID in the MAC header is a predetermined "Initial ranging CID" used only for initialization purposes. *Id.*; Appx4344 (¶10.4, Table 345). Periodic ranging requests thereafter use the Basic CID assigned to the connection between that particular SS and BS in the MAC header. Appx3750.

The ranging request (RNG-REQ) message also includes type/length/value (TLV) encoded information. *Id.*; Appx3717. WiMAX teaches that the TLV encoded information in an initialization RNG-REQ message includes, *inter alia*, the Requested Downlink Burst Profile and the SS MAC Address. Appx3750; Appx4365. The MAC Address is a 48-bit code, assigned at manufacture, that "uniquely defines the SS from within the set of all possible vendors and equipment

types." Appx3734; Appx3869. The Downlink Burst Profile is a "[s]et of parameters that describe the . . . downlink transmission properties." Appx3708.

WiMAX then teaches that the BS sends a particular Ranging Response (RNG-RSP) message in response to an initialization RNG-REQ message from a SS. Appx3751. When the "RNG-RSP message is being sent on the Initial Ranging CID in response to a RNG-REQ that was sent on the Initial Ranging CID," required parameters in the TLV Encoded Information of the RNG-RSP message include the "Basic CID," "Primary Management CID," and "SS MAC Address." Appx3751; Appx4366-4367. The RNG-RSP message will also include a "Downlink Operational Burst Profile" that "is sent in response to the RNG-REQ Requested Downlink Burst Profile parameter." *Id.*

### 2. DOCSIS 2.0

DOCSIS 2.0[5] is a "second generation of radio-frequency specifications for high-speed data-over-cable systems" developed by CableLabs. Appx1667. In DOCSIS 2.0, "[t]he transmission path over the cable system is realized at the head-end by a Cable Modem Termination System (CMTS), and at each customer location by a Cable Modem (CM)." Appx1669.

[5] Data-Over-Cable Service Interface Specifications DOCSIS 2.0 Radio Frequency Interface Specification CM-SP-RFIv2.0-I11-060602 ("DOCSIS"). Appx1643-2178.

Part 8 of DOCSIS 2.0 defines a Media Access Control (MAC) protocol. Appx1777. In that protocol, data is exchanged between the CMTS and CM in units called MAC frames. Appx1779-1780. DOCSIS 2.0 teaches that "[a] MAC frame consists of a MAC Header . . . and may incorporate a variable-length data PDU." Appx1779.

DOCSIS 2.0 further teaches that MAC frames may be used to send MAC Management Messages. Appx1798-1799. One type of MAC Management Message that DOCSIS 2.0 teaches is a Test Request (TST-REQ). Appx1850. The Test Request message is sent by the CMTS (when directed by a cable service provider operator) to force a CM to enter or leave one of two testing modes. *Id.* In the first test mode, the TST-REQ message causes the CM to "[t]ransmit a continuous (non-bursted) upstream signal at the commanded modulation rate, carrier frequency, and power level." Appx1851-1852. DOCSIS 2.0 specifies the format of the Test Request message and how the parameters are encoded in the TLV portion of the message. *Id.*

### C. The Board Decision

In the Final Written Decision, the Board determined that claims 1-3, 6-9, 14-17, and 22-24 are unpatentable over WiMAX alone or in combination with other prior art. Appx1-82. The Board also determined that claims 9, 10, 17, and 18 are unpatentable over DOCSIS 2.0 alone or in combination with other prior

art. *Id.* The Board also determined that claim 9 would have been unpatentable over Waxman alone, a determination that Entropic does not challenge. *Id.*

First, the Board construed "probe," a term in every claim on appeal. Appx17-21. The Board rejected Entropic's proposed construction of "probe" as "a signal or message that is used to characterize (or assess) the communications channel (or path) between the two nodes" as too narrow in view of the intrinsic record. Appx17; Appx20. The Board determined that the claims of the '690 patent themselves do not include language limiting a "probe" to use for "channel assessment," noting to the contrary that "dependent claim 7 . . . recites that the 'probe' is used to diagnose a network problem, and dependent claim 13 recites that the 'probe' is used to identify a hidden node." Appx20 (quoting claims at Appx109). The Board also determined that the specification of the '690 patent does not limit the use of a "probe" to channel assessment, as it describes using probes to "discover hidden nodes," for "off-site network diagnosis," for "network maintenance procedures," or to "replicate a potential problem, reach or discover a distant or previously undetected node on the network, or assist with network admission procedures." Appx20 (citing and/or quoting Appx103 (1:13-14, 2:20-27), Appx104 (4:25-38)). After declining to limit the construction of "probe" to channel characterization or assessment, the Board concluded that it need not construe the term further to resolve the parties' disputes. Appx21.

Turning to unpatentability, the Board considered whether various claims of the ’690 patent are anticipated by WiMAX. Appx25. The Board began with an overview of WiMAX’s teachings. Appx26-27. The Board then found that claim 1 of the ’690 patent is anticipated by WiMAX. Appx27-31.

The Board began its analysis of claim 1 by considering Entropic’s argument that WiMAX does not teach the recited “probe” or “probe request,” but rejected those arguments in view of its construction of “probe.” Appx27-28. The Board then rejected Entropic’s argument that WiMAX does not teach that the “probe request . . . at least specify content payload of the probe.” Appx28. Specifically, the Board found that WiMAX teaches that the CID is a parameter included (via the MAC header) in the Ranging Request (RNG-REQ) causing the CID information to be included (via the encoded TLV information) in the payload of the Ranging Response (RNG-RSP). Appx28-29 (citing, e.g., Appx3734; Appx3736; Appx3743-3744; Appx3750-3752; Appx3877; Appx3905-3914; Appx4277-4280; Appx4366-4367; Appx845-846; Appx9783-9792; Appx9793-9796).

The Board then continued with a limitation-by-limitation explanation of why WiMAX teaches all limitations of claim 1. Appx29-31. For example, with respect to limitation 1A, the Board found that WiMAX teaches each of a “first node” (BS), “probe request” (Ranging Request), “first plurality of parameters”

(SS MAC address and CID), "probe" (Ranging Response), "first plurality of parameters at least specify content payload of the probe" (CID in the Ranging Requests causes CID to be included in the TLV portion of the Ranging Response payload), and "first plurality of parameters specify . . . a second node" (MAC address in the Ranging Request identifies the SS). Appx29-30. The Board rejected Entropic's arguments that WiMAX lacks a "probe" because all of Entropic's arguments relied on Entropic's too-narrow construction. Appx27-30; *see also* Appx414-417, Appx527-528.

After addressing other claims and prior art not separately argued in this appeal (Appx31-65), the Board considered whether DOCSIS 2.0 anticipates claim 9. Appx65. The Board began with an overview of the testing procedure that DOCSIS 2.0 teaches. Appx66. The Board then turned to limitation 9A, the only limitation that Entropic contested with respect to DOCSIS 2.0. Appx66-68.

Limitation 9A recites: "a first node transmitting a probe request to a second node, the probe request specifying a first plurality of probe parameters for a physical layer probe, the first plurality of probe parameters comprising a form for the probe including a modulation profile for the probe." Appx67 (quoting claim 9 at Appx109). The Board agreed with Comcast that the Test Response generated by the CM in DOCSIS 2.0 teaches a "probe" under the plain and ordinary meaning of that term and rejected Entropic's arguments that depended on its narrowing

claim construction. Appx67-68. The Board also found that claim 9 does not require the "first node" (here, the CMTS) to take any specific action with regard to the "probe" sent by the "second node" (CM). Appx68.

The Board also assessed Comcast's contentions for the remaining portions of claim 9, and found that Comcast had shown that DOCSIS 2.0 taught those limitations. Appx65-69. The Board therefore found that DOCSIS 2.0 anticipates claim 9 of the '690 patent. Appx66-69. The Board then determined that claims 10, 17, and 18 would have been obvious over DOCSIS 2.0 and Zuckerman. Appx69-79.

## III. SUMMARY OF THE ARGUMENT

The Board's determinations that claims 1-3, 6-10, 14-18, and 22-24 of the '690 patent are unpatentable as they are anticipated, would have been obvious, or both are supported by substantial evidence, legally correct, and should be affirmed.

First, for claims 1-3, 6-8, 10, 14-18, and 22-24, Entropic incorrectly argues that the Board erred in its construction of the claim term "probe." The Board correctly rejected Entropic's vague, narrowing construction requiring that a "probe" be limited to characterizing or assessing a network communication channel. The intrinsic record, including the claims' broad language and the specification's description of the wide range of uses for probes, shows that the

claimed "probe" is not so limited. The Board also properly concluded that it was unnecessary to resort to extrinsic evidence given the clarity of the intrinsic record.

Second, for claims 1-3, 6-8, 10, 14-18, and 22-24, the Board correctly concluded that it need not construe "probe" further because all of Entropic's arguments for patentability relied on Entropic's incorrect construction of "probe." Entropic's Brief identifies no argument it put before the Board that did not rely on its incorrect construction, under which a "probe" must characterize or assess a channel. The Board's Decision provides an appropriate basis for review because the Board explained how the prior art teaches the claimed "probe" under its plain and ordinary meaning.

Third, for claim 1 and its dependent claims 2, 3, and 6-8, Entropic attempts to raise a claim construction dispute where none exists by arguing that the Board implicitly applied a new construction of "specify" in the Final Written Decision. But no party asked for a construction of "specify," and the Board's Decision shows that the Board correctly applied the plain and ordinary meaning of "specify" in making its findings. The Board's finding that WiMAX teaches the "specify" portion of claim 1 is supported by substantial evidence.

The Board's decision should thus be affirmed.

## IV. STANDARD OF REVIEW

Entropic has the burden to show that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004). This Court upholds fact findings made by the Board that are supported by substantial evidence, 5 U.S.C. § 706(2)(E), and reviews the Board's legal conclusions *de novo*, *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

This Court reviews the Board's claim constructions *de novo* and any underlying factual determinations involving extrinsic evidence for substantial evidence. *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1361-62 (Fed. Cir. 2018).

"Anticipation is a question of fact reviewed for substantial evidence." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010).

Although the ultimate determination of obviousness is a legal conclusion, it is based on underlying factual findings. *Gartside*, 203 F.3d at 1316. What a

prior-art reference teaches is one of the questions of fact underlying obviousness. *In re Urbanski*, 809 F.3d 1237, 1241 (Fed. Cir. 2016).

## V. ARGUMENT

Entropic's central argument is that the Board erred by not importing a limitation from the specification into its construction of "probe." But the Board's construction of "probe" is supported by the intrinsic record. The Board's decision provides an appropriate record for review by explaining the Board's bases for finding that the prior art teaches the claimed "probe" under the construction the Board correctly adopted. The Board did not apply a new construction of "specify" in its decision, and its finding that WiMAX teaches the "specify" limitation of claim 1 is supported by substantial evidence.

### A. The Board correctly rejected Entropic's attempt to use examples from the specification to import limitations into the construction of "probe."

Entropic proposes an incorrect construction of "probe" as "a signal or message that is used to characterize (or assess) the communications channel (or path) between the two nodes." Br. 38. The Board correctly rejected Entropic's attempt to read a narrowing limitation from the specification into the claims. Appx17-21; *see Polaris Innovations Ltd. v. Brent*, 48 F.4th 1365, 1377 (Fed. Cir. 2022); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002).

### 1. The Board's rejection of Entropic's narrowing claim construction was correct in view of the intrinsic record.

*a.* Claim construction begins with the language of the claims themselves. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Claim 1 does not require characterizing (or assessing) a channel or even recite "characterize," "assess," or "channel." Appx109 (13:45-58). Instead, claim 1 broadly recites "a first probe request specifying a first plurality of parameters . . . wherein the first plurality of parameters at least specify content payload of the probe." In other words, the only limitation on the form of the "probe" is that its payload contents result, in some manner, from a "probe request" parameter. There is no requirement that the probe include content, or be transmitted in a manner, that aids in characterizing (or assessing) the connection between the first and second nodes, much less a requirement that it is "used" for that purpose by the "first node" as required by Entropic's proposed construction.

Similarly, claim 9 recites only that the "probe request" specify "a modulation profile for the probe." Appx109 (14:18-28). Claim 17 combines both "payload content" and "modulation profile" requirements for the "probe," but, like claims 1 and 9, recites no limitation specifically directed to a "channel," "characterization," or "assessment." Appx109-110 (14:59-15:15). Thus, the Board correctly concluded that "the evidence of record does not establish that the

independent claims recite anything unique or specific to channel assessment (although their scope covers that purpose)." Appx20.

The Board also correctly concluded that certain dependent claims confirm the broad scope of "probe" in the independent claims. Appx20-21. Claim 7, which depends from claim 1, broadly recites that the "probe assists in diagnosing a *network problem*" without limiting the "network problem" to be one related to channel characteristics or involving channel assessment. Appx109 (14:13-14) (emphasis added); *see also id.* (14:54-55 (claim 15)). Claim 13, which depends from claim 9, broadly recites that the "probe request is configured such that the probe identifies a hidden node," again indicating a broader range of purposes for probes than characterizing a channel. *Id.* (14:54-55). Entropic's argument that the dependent claims specify applications of the "channel assessment probes" is based on its misreading of the specification, as discussed further below. Br. 36-37.

*b.* As the Board correctly determined, the specification of the '690 patent also contradicts Entropic's proposed limiting construction of "probe." Appx20. While Entropic cites the specification's description of the Technical Field for support, the cited portion actually states that only "*some* embodiments relate to channel assessment probes." Br. 28-29; Appx103 (1:14) (emphasis added). Similarly, Entropic's citation of the specification's discussion of "network

problems" related to "subscriber services" comports with the Technical Field as "communication networks," and does nothing to limit the meaning of "probe" to characterizing or assessing a channel. Br. 28-29 (citing Appx103 (1:31-34)); Appx103 (1:12-13); *see also* Appx103 (1:30-40) (broadly describing "network problems" as problems that "require[] sending a technician to the physical location of the home network to personally assess the network and diagnose the problem").

In the context of a paragraph that describes "many embodiments" for the use of "network probes" in different types of networks, the '690 patent specification further states that "a probe can replicate a potential problem, reach or discover a distant or previously undetected node on the network, or assist with network admission procedures." Appx104 (4:36-38). This language unmistakably identifies uses for probes well beyond helping to characterize or assess the channel between two network nodes. Without explaining why replicating network problems would be limited to characterizing a channel—much less explaining how node discovery and network admission would be limited to characterizing a channel—Entropic incorrectly asserts that this same language supports its limiting construction of "probe." Br. 28-29, 30-32.

Entropic's further arguments continue to ignore context or make unreasonable assertions about the meaning of the '690 patent specification. For

example, Entropic points to language in the specification that "probes may be used for OFDMA sub-channel assessment," but omits that the preceding sentence states that "probes may be used in a variety of applications" and that another exemplary application in the same sentence of the specification is that "probes may be used to reach or discover hidden nodes." Br. 29; Appx103 (2:20-25).

Likewise, Entropic incorrectly argues that a third category for probe use in that sentence, "off-site network diagnosis" (and similar "diagnostic" or "maintenance" references elsewhere), means performing channel characterization or assessment. Br. 29-30. But the specification distinguishes those uses, stating, for example, that "[i]n many embodiments, network probes are used to perform various channel assessment *or* network maintenance procedures." Appx103 (2:21-27); Appx104 (4:25-38) (emphasis added). Thus, the specification distinguishes "channel assessment" from "network maintenance procedures;" it does not, as Entropic contends (Br. 30), "equate[]" them.

Similarly, the specification distinguishes among the multiple sub-types of probes that it discloses when discussing the specification of probe preambles in a probe request: "For example, [1] *diagnostic probe* requests could be unrestricted in terms of the available preambles *while* [2] *network maintenance* or assessment *or* [3] *channel assessment* probe requests could be restricted in terms of their available preambles." Appx106 (8:43-47) (emphases added). That passage

differentiates between probes for diagnostic use, probes for network maintenance, and probes for channel assessment. Another passage of the specification confirms that the diagnostic use of probes is distinct from—not equivalent to—using probes for channel assessment: "For example, a probe request may specify that the generated probe be repeated to allow improved channel assessment *or* to diagnosis [sic] a particular network issue." Appx107 (9:44-47) (emphasis added).

Finally, Entropic's arguments about the specification contravene this Court's caselaw. While the claims must "be read in view of the specification, of which they are a part," *Phillips*, 415 F.3d at 1315 (internal quotation omitted), "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited," *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Nothing that Entropic identifies in the '690 patent specification meets the high bar for such "a clear indication." Instead, Entropic invites this Court to do precisely what this Court has cautioned against. "Interpreting what is *meant* by a word *in* a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Cruciferous Sprout*, 301 F.3d at 1348 (cleaned up) (emphases original). And while Entropic argues (Br. 34) that "[c]laim construction is not an exercise in interpreting the terms to capture

the most examples in the specification," the examples discussed above and cited by the Board collectively reflect a broader understanding of the term "probe" than the construction that Entropic urges this Court to adopt.

*c.* The Board found that "the parties [did not] mention the prosecution history in their proposed constructions." Appx21. The Board thus did not comment on the particular prosecution history cited by Entropic (Br. 37), but the Board concluded there is "nothing helpful toward the proper construction of the term 'probe'" from its own review of the prosecution history. Appx21. Furthermore, the mere fact that the Examiner relied on a prior art reference alleged to use transmissions to "determine characteristics of the channel" as falling within the scope of the claimed "probe" indicates nothing about the Examiner's understanding of the full scope of the claim term "probe." *See* Br. 37; Appx1322. The Board's construction of "probe" as including signals for channel assessment, but not limited to signals for that purpose (Appx20), is fully consistent with the cited portion of the prosecution history.

The intrinsic record fully supports the Board's decision to construe "probe" to have its plain and ordinary meaning consistent with the full scope of examples in the '690 patent specification and not to construe "probe" as limited to channel characterization and assessment uses.

### 2. The Board correctly concluded that it need not consider extrinsic evidence because the intrinsic record is clear.

In general, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence" and is thus "less reliable than the patent and the prosecution history" in claim construction. *Phillips*, 415 F.3d at 1318-19. This Court has thus held that "resort to extrinsic evidence is unnecessary" when the intrinsic evidence is clear. *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1290 (Fed. Cir. 2021); *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 130 F.4th 1372, 1383 (Fed. Cir. 2025). Here, the Board correctly concluded that "the meaning of the term 'probe' is sufficiently clear from the '690 patent" and that "resort to extrinsic evidence" was unnecessary. Appx21.

Entropic's argument (*see, e.g.*, Br. 38-40) that this Court should rely on extrinsic evidence to narrow the meaning of "probe" in contradiction to the intrinsic record is unpersuasive. Entropic selectively picks words and phrases from the experts' testimony for support, but the full testimony does not support Entropic's construction and fails to provide insight into the intrinsic record. Br. 32-33, 38.

To start, Entropic contends that the parties' experts agreed that probes were limited to characterizing or assessing a channel. Br. 32-33, 38-39. But Comcast's expert, Mr. Bertonis, did not agree that a "probe" must characterize or assess a

channel. The full range of testimony by Mr. Bertonis that Entropic cites demonstrates an inability by Mr. Bertonis and the questioning attorney to establish a clear understanding. *See* Appx12467-12472 (pages 8:2 through 26:18). Thus, there are multiple examples from the transcript that contradict Entropic's characterization of Mr. Bertonis's testimony. For example, Mr. Bertonis testified that one example of a probe in the context of the '690 patent is "looking for users on the network," not just channel assessment. Appx12467 (8:2-15). He also testified that the various examples of probes in the '690 patent would be included in the meaning of probe. Appx12468 (13:12-17). Mr. Bertonis also testified that his understanding of "the plain and ordinary meaning of probe as it's used in the '690 patent" is "a transmission in response to a request from the node that would be receiving the probe." Appx12469 (14:16-22). This is clearly a far broader definition than the narrow one Entropic alleges that he endorsed.

On the other hand, the cited testimony from Mr. Holobinko (Entropic's expert) muddies, rather than clarifies, the meaning of "probe." The construction of "probe" that Mr. Holobinko offered in his Declaration in support of the Patent Owner Response is different from the one that Entropic now advocates and the accompanying explanation is conclusory—making flat assertions about Mr. Bertonis's deposition testimony and the '690 patent specification without supportive reasoning or explanation. Appx13367-13369 (¶¶47-49).

The rest of Entropic's extrinsic evidence is also unpersuasive. Entropic's contention that a handful of other patents from the time the '690 patent application was filed use "probe" consistent with the scope of Entropic's construction does nothing to identify the proper construction of "probe" for the '690 patent. Br. 39-40. All of Entropic's citations discuss using a "probe" for a particular application; none of the cited material purports to define "probe." *Id.*

In sum, the correct construction of "probe" is clear from the intrinsic record alone, and the extrinsic evidence that Entropic argues on appeal does not aid in understanding that term. The Court should therefore affirm the Board's construction of "probe." If the Court disagrees, the Director respectfully believes that remand is the proper remedy, rather than reversal as Entropic advocates. *See Kaken Pharm. Co., Ltd. v. Iancu*, 952 F.3d 1346, 1355 (Fed. Cir. 2020) ("We conclude that the appropriate course in this case, as in so many others involving a reversal of a Board claim construction, is to vacate the Board's decision and remand the matter.").

**B. After rejecting Entropic's construction of "probe," the Board correctly concluded that the plain and ordinary meaning of "probe" was sufficient to decide the remaining issues.**

Having correctly concluded that the proper construction of "probe" is not limited to channel characterization or assessment, the Board correctly concluded that no further construction of "probe" was necessary. Appx21. Contrary to

Entropic's argument now, the Board's Decision is sufficient for review, and Entropic cannot convert its forfeiture of further argument about the plain and ordinary meaning of "probe" before the Board into an APA violation. Br. 43-49. Having addressed all of Entropic's arguments, rejected those arguments, and found the Petition's contentions persuasive, the Board did all that it needed to do.

In the Petition, Comcast argued that all patent terms should be construed to have their plain and ordinary meaning. Appx132. In the Preliminary Response, Entropic argued for the construction of "probe" adopted by the Eastern District of Texas in a related proceeding—a different construction than the one it urges now. Appx266. In its patentability arguments, Entropic argued only that the plain and ordinary meaning of "probe" requires "channel assessment" and did not identify any argument that WiMAX or DOCSIS 2.0 does not teach a "probe" if that construction were rejected. *See, e.g.*, Appx277; Appx304-305. In the Institution Decision, the Board was already expressing skepticism about the Eastern District construction in light of the intrinsic record. Appx324.

The same pattern continued after institution of the IPR trial. In the Patent Owner response, Entropic altered the wording of its proposed construction of "probe," but continued to argue that even the plain and ordinary meaning of "probe" means that it "characterizes the channel." Appx407; Appx409. Entropic offered no alternative construction or additional requirements for the plain and

ordinary meaning. *Id.* In arguing for patentability, Entropic relied upon its "characterization" construction and offered no argument that the evidence Comcast had identified in the prior art was otherwise insufficient to teach a "probe." *See, e.g.*, Appx411-412; Appx414-418; Appx446-450. In its Sur-Reply, Entropic again focused on arguing that the appropriate construction of "probe" had to include channel assessment without identifying any other requirements for the construction of "probe." Appx517-525. Entropic's patentability arguments again relied on its 'characterizing the channel' claim construction, and nothing else. Appx527-528; Appx535-536. Nowhere did Entropic argue that the challenged claims were patentable under any broader construction.

In short, as the Board concluded, all of Entropic's arguments that WiMAX and DOCSIS 2.0 do not teach a "probe" relied on its improper claim construction. Appx21. Entropic therefore forfeited any argument that WiMAX and DOCSIS 2.0 do not teach a "probe" under the construction that Comcast urged and the Board ultimately adopted. This Court has further explained that "[t]he Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Entropic had ample notice that the Petition relied upon giving "probe" its plain and ordinary meaning for its unpatentability arguments.

The APA requires only that the Board "present its reasoning in sufficient detail that the court may conduct meaningful review of" its Decision. *In re Sang-Su Lee*, 277 F.3d 1338, 1346 (Fed. Cir. 2002); *see also Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123 (Fed. Cir. 2022) (collecting cases). Moreover, this Court may affirm the Board's Decision if it "may reasonably discern that [the Board] followed a proper path, even if that path is less than perfectly clear." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015). Here, the Board considered and rejected Entropic's arguments on claim construction; even Entropic does not argue otherwise. The Board has also clearly identified the evidence it found sufficient to establish that the WiMAX Ranging Response (RNG-RSP) message and the DOCSIS Test Response teach a "probe," when given its plain and ordinary meaning. Appx26-27; Appx29-30; Appx66-68. This is sufficient for this Court to conduct "meaningful review."

Entropic's arguments based on caselaw are unpersuasive. Br. 43, 48-49. In *In re Nuvasive*, 842 F.3d 1376, 1383-85 (Fed. Cir. 2016), "the PTAB acknowledged that the key issue" was motivation to combine, but "[t]he majority of the PTAB's analysis was limited to summaries of the parties' arguments" and "failed to articulate a reason why the PHOSITA would have been motivated to

modify" the prior art. Entropic identifies no pertinent argument it made that the Board failed to address.

Entropic also relies on this Court's nonprecedential decision in *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016), but *Cutsforth* is highly similar to *Nuvasive*. In *Cutsforth*, "the majority of the Board's Final Written Decision [was] spent summarizing the parties' arguments and offer[ed] only conclusory analysis of its own." 636 F. App'x at 578. Thus, it was not possible for this Court to "conduct meaningful review" of the Board's decision as to the contested limitations. *Id.* at 577 (citing *Sang-Su Lee*, 277 F.3d at 1343-45). That is not the situation here because the Board fully explained its claim construction decision, identified the elements in the prior art that teach a "probe," and identified the evidence it relied upon to support that determination.

Entropic's reliance on the nonprecedential *Securus Technologies, Inc. v. Global Tel*Link Corp.*, 685 F. App'x 979, 987 (Fed. Cir. 2017) is also unavailing. The portion of *Securus* decision relied on by Entropic cites *Sang-Su Lee* in support of the need for an explanation by the Board sufficient to allow judicial review. *Sang-Su Lee* concerned an inadequate explanation with regard to a *contested* motivation to combine finding (277 F.3d at 1341-42, 1343). By contrast, the Board decided every contested issue here, and the Board explained its findings as

to the prior art's teachings and identified the supporting evidence in support of its findings for all of the issues. The Board did what it needed to do under the APA.

### C. The Court should affirm the Board's finding that WiMAX teaches the "specify" limitation of claim 1.

#### 1. Substantial evidence review applies.

Entropic challenges the Board's finding that WiMAX teaches "wherein the first plurality of parameters at least specify content payload of the probe" in claim 1 of the '690 patent.[6] Br. 49-57. Entropic must prove that the finding is not supported by substantial evidence. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).

Instead, Entropic claims that its challenge raises a *de novo*-reviewed claim-construction issue. Br. 49-55. But Entropic's arguments about a new claim construction of "specify" by the Board are nothing more than a straw man. The Court should reject that framing, not least because Entropic, by its own admission, did not seek to construe "specify" before the Board and merely seeks to apply its plain and ordinary meaning. *Id.* at 50-52. The Board did not construe "specify" in the claim-construction portion of its decision (Appx16-24), and the Board's

[6] This portion of Entropic's argument is specific to the evidence the Board relied upon to find claims 1-3 and 6-8 of the '690 patent anticipated or obvious. More specifically, Entropic's argument turns on the Board's treatment of "CID" in WiMAX as one of the "first plurality of parameters." The Board only relied on "CID" for independent claim 1 and its dependent claims.

findings as to WiMAX reflect that the Board correctly applied the plain and ordinary meaning of the term (Appx27-30).

Entropic's argument that Board introduced a construction of "specify" that is not the plain and ordinary meaning and that *de novo* review applies starts from a footnote in the Board's Decision. Br. 51 (citing Appx29 (n.12)). For at least two reasons, that footnote does not support Entropic's arguments.

First, the footnote does not state that the Board construed "specify" to have anything other than its plain and ordinary meaning. The footnote states only that the Board conducted a "further study of the claim language." Appx29 (n.12). And the footnote does not suggest that the "causation" component of "specify," that forms the root of Entropic's argument, does not apply. *See* Br. 49 ("for one parameter to 'specify' another, it must define or cause that parameter to have a value"); Br. 50 ("the plain meaning of the word 'specify' as having a causal or definitional nature"); Br. 51 (alleging Board did not find "the CID in the Ranging Response caused the Basic CID in the Ranging Response to be of a certain value"); Br. 54 ("'specify' requires a causal relationship").

Second, the footnote explicitly refers to a concern about the prior art that the Board had previously raised in the Institution Decision but that no longer applied. In the Institution Decision, the Board initially determined that Comcast was not likely to prevail in demonstrating that claim 1 of the '690 patent was

anticipated by WiMAX because Comcast had "not show[n] sufficiently that the CID, located in the header [of MAC management messages], specifies content payload of a MAC message." Appx326-327.

While Entropic contends that the discussion of the term "specify" at oral argument implied a new construction, the Decision reflects otherwise. Br. at 52-53; Appx16-24. Furthermore, in the portion of the oral hearing transcript that Entropic cites (Br. 53), the context for the "CID . . . specifying itself" snippet that Entropic references is the immediately preceding question from the same ALJ as to whether "the CID in the request is specifying the CID in the response." Appx590 (18:15-16). Similarly, the Comcast demonstrative that serves as the basis of that discussion at the oral hearing, reflects evidence that the CID in the Ranging Request header causes the "Basic CID" to be part of the payload of the Ranging Response. *See* Appx590 (18:1-8); Appx12367. Just after that exchange, Comcast's counsel confirms that Comcast did not offer a specific construction of "specify" and only seeks to apply the "typical" meaning of that term. Appx590-591 (18:24-19:7).

In sum, the Board's final written decision did not introduce a new construction that deviated from the plain and ordinary meaning of "specify." Thus, the real issue is not one of claim construction, but one of applying the plain and ordinary meaning of "specify" to WiMAX—and the Board's findings about

that issue are factual findings reviewed for substantial evidence. *In re Urbanski*, 809 F.3d at 1241. As discussed next, substantial evidence supports those findings.

**2. Substantial evidence supports the Board's finding that WiMAX teaches the "specify" limitation.**

Applying the plain and ordinary meaning of "specify" as the Board did, substantial evidence supports the Board's finding that WiMAX teaches that "the first plurality of parameters at least specify content payload of the probe." Addressing claim limitation 1A, the Board found that WiMAX teaches [1] the BS ("first node") "receiving" a Ranging Request (RNG-REQ) ("probe request") [2] "specifying" the SS MAC address and CID ("first plurality of parameters") [3] used for "generation and transmission" of [4] the Ranging Response (RNG-RSP) ("probe"), [5] wherein the CID (in the MAC header of the Ranging Request) specifies the CID be part of the TLV information of the Ranging Response ("first plurality of parameters at least specify content payload of the probe") and [6] the SS MAC address specifies the SS ("first plurality of parameters at least specify . . . a second node"). Appx28-29; Appx29-30.

Entropic mistakenly challenges the causal link between the CID in the Ranging Request header and the CID in the TLV information of the Ranging Response. Br. 55-57. As the Board found, the connection identifier (CID) is a field in the Generic MAC header of messages between a subscriber station (SS) and a base station (BS). Appx3708; Appx3714; Appx3734; Appx3736-3737. A

Ranging Request (RNG-REQ) MAC Management message from a SS to a BS therefore includes the CID as part of the Generic MAC header. Appx3743-3744. In the first Ranging Request message by a SS (at initialization), the CID in the MAC header is a predetermined "Initial ranging CID" used only for initialization purposes. Appx3750; Appx4344.

The BS sends a particular Ranging Response (RNG-RSP) message in response to an initialization RNG-REQ message from a SS. Appx3751. The "Basic CID" and "Primary Management CID" are "required parameter[s] [of the TLV Encoded payload] if the RNG-RSP message is being sent on the Initial Ranging CID in response to an RNG-REQ that was sent on the Initial Ranging CID." Appx3751; Appx4366-4367. The BS and SS use the Basic CID or Primary Management CID (depending on urgency) for communication thereafter. Appx3734. Thus, the Initial ranging CID in the Ranging Request message by the SS at initialization "specifies" that the BS must include a Basic CID and Primary Management CID in the payload when the BS sends the Ranging Response. Comcast's expert, Mr. Bertonis, provided supporting explanation. Appx9794-9796 (¶38). The Board cites these disclosures and others of WiMAX and Mr. Bertonis's testimony in support of its findings. Appx28-29; Appx30.

Entropic's argument that the Ranging Request does not "specify" the exact value of the Basic CID or Primary Management CID in the payload of the Ranging

Response message is unpersuasive. Br. 56-57. Earlier in its Brief, Entropic argues that the plain and ordinary meaning of "specify" merely requires causation. Br. 50. WiMAX's teaching that the Basic CID is a "required parameter" in the TLV payload of the Ranging Response "in response to a RNG-REQ message that was sent on the Initial Ranging CID" is clear evidence of causation sufficient to satisfy the plain and ordinary meaning of "specify." Appx3751. A job offer that requires a response within one week, "specifies" that a response will occur even though it does not specify the content of the response (yes or no). Similarly, the offer "specifies" timing even though the time of the response may fall anywhere within one week.

The Board having applied the plain and ordinary meaning of "specify" and explained the basis for its findings as to WiMAX's teachings, this Court should affirm the Board's determinations that claims 1-3, 6, and 7 are anticipated by WiMAX and that claim 8 would have been obvious over WiMAX and Won.

## VI. CONCLUSION

For all these reasons, this Court should affirm the Board's decision that claims 1-3, 6-10, 14-18, and 22-24 of the '690 patent are unpatentable as anticipated by and obvious over WiMAX, DOCSIS 2.0, and other prior art.

September 30, 2026

Respectfully submitted,

*/s/ Peter J. Sawert*
AUSTIN P. MAYRON
Deputy Solicitor

ROBERT J. MCMANUS
Senior IP Legal Counsel

KEVIN K. MCNISH
Senior Counsel for Patent Law and Litigation

PETER J. SAWERT
OMAR F. AMIN
Associate Solicitors

Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to FRAP 32(a)(7) that the foregoing BRIEF FOR DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type volume limitation. The total number of words in the foregoing brief, excluding the table of contents and table of authorities, is 8,112 as measured by the word-processing software used to prepare this brief.

Dated: September 30, 2026

Respectfully submitted,

/s/ *Peter J. Sawert*

Peter J. Sawert
Associate Solicitor
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035