2026-1471

# United States Court of Appeals
# For the Federal Circuit

ENTROPIC COMMUNICATIONS, LLC,
*Appellant*

v.

JOHN A. SQUIRES, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
*Intervenor*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2024-00430.

## APPELLANT'S REPLY BRIEF

November 12, 2026

Jason A. Engel
Vincent J. Galluzzo
Ryan P. Regan
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
E-mail: jason.engel@klgates.com
vincent.galluzzo@klgates.com
ryan.regan@klgates.com

**COUNSEL FOR APPELLANT ENTROPIC COMMUNICATIONS, LLC.**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ....... 1
ARGUMENT ....... 2
I. THE BOARD'S INCORRECT CONSTRUCTION OF THE TERM "PROBE" ....... 2
A. Both Experts Agreed on the Ordinary and Customary Meaning of "Probe" ....... 3
B. The Intrinsic Record Supports Appellant's Construction ....... 6
1. The Independent Claims Support Entropic's Construction ....... 7
2. The Dependent Claims Support Appellant's Construction ....... 8
3. The Specification Supports Entropic's Construction ....... 9
C. The Proper Remedy Is Reversal, Not Remand ....... 13
II. EVEN UNDER THE BOARD'S CONSTRUCTION, THE BOARD'S DECISION VIOLATED THE APA ....... 13
A. Entropic Preserved Its Objection, and the Director's Forfeiture Theory Fails ....... 13
B. Rejecting Entropic's Construction Is Not an Explanation of Why the Reference Discloses a "Probe" ....... 18
III. THE BOARD ERRED IN ITS ANALYSIS AND CONSTRUCTION OF THE "SPECIFY … CONTENT PAYLOAD" REQUIREMENT ....... 22
A. Footnote 12 Resolves Claim Scope, and That Legal Determination Receives De Novo Review ....... 22
B. Even Under Substantial Evidence Review, the Cited Disclosures Do Not Establish That the Request Parameters "Specify Content Payload" ....... 26
CONCLUSION ....... 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015).....22

*Calcutt v. FDIC*,
598 U.S. 623 (2023).....28

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) (nonprecedential).....21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020).....28

*FanDuel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020).....17

*Glob. Tel*link Corp. v. Securus Technologies, Inc.*,
No. IPR2014-01278, 2016 WL 783391 (P.T.A.B. Jan. 21, 2016).....21

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024).....24, 25, 26

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016).....23

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
877 F.3d 1361 (Fed. Cir. 2017).....24

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016).....18

*In re Sang Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002).....20

*In re Urbanski*,
809 F.3d 1237 (Fed. Cir. 2016).....23, 24

*Kaken Pharm. Co., Ltd. v. Iancu*,
952 F.3d 1346 (Fed. Cir. 2020).....28

*Metrom Rail, LLC v. Siemens Mobility, Inc.*,
No. 24-2223, 2026 WL 1295229 (Fed. Cir. May 11, 2026) (nonprecedential).....23

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Personalized Media Communications v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020)....................................................................13

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)......................................................................2

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015)....................................................................28

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) ...................................................................... 18, 19

*Reynolds v. Wagner*,
128 F.3d 166 (3d Cir. 1997)..........................................................................6

*Securus Technologies, Inc. v. Global Tel*Link Corp.*,
685 F. App'x 979 (Fed. Cir. 2017) (nonprecedential)................................. 20, 21

**Statutes**

35 U.S.C. § 316(e) .........................................................................................17

## INTRODUCTION

The goal of claim construction is to identify the meaning that the term would have to a skilled artisan at the time of the invention. The Board had access to two skilled artisans, both of whom agreed on the accepted meaning of the term "probe," yet the Board rejected that agreed construction when Entropic proposed it. The Director attempts to downplay the agreement of the skilled artisans, but the Director reads too much into deposition transcripts when plain questions and answers provide clarity. The Director's other arguments only amount to surface-level disagreement with Entropic's analysis of why the intrinsic record *also* supports Entropic's construction. And the Director says that remand is appropriate but fails to cite any evidence to support a finding of obviousness under the correct construction. None exists, so the Court should reverse.

Should the Court not overturn the Board's construction of "probe," Entropic's APA challenge has not been forfeited. Entropic consistently told the Board that the prior art disclosed only plain messages for exchanging parameters—something that is not a "probe" even under the Board's "plain and ordinary meaning." Moreover, the APA obligates the Board to provide reasoning, not just a result, especially where the Board failed to ever say what a "probe" is. The Court should vacate and remand.

Finally, the Director defends the Board's *sua sponte* construction of "specify" by advancing a new data-field theory that appears nowhere in Petitioner's

submissions to the Board or in the Board's Decisions. A *post hoc* rationalization by the Director cannot substitute for the Board's actual (and legally defective) "specify itself" rationale. The Court should reverse.

## ARGUMENT

### I. THE BOARD'S INCORRECT CONSTRUCTION OF THE TERM "PROBE"

The fundamental purpose of claim construction is to discern the "ordinary and customary" meaning of a claim term, to give it "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005). In this case, there were two persons of ordinary skill in the art—the experts on both sides—who testified to the ordinary and customary meaning of "probe" at the time of the invention. Blue Br. 38-39. That is the correct construction, and it is the construction the Board should have adopted.

The Director accuses Entropic of attempting to "import[] a limitation from the specification" into the meaning of "probe" (Red. Br. 19) and of mischaracterizing the experts' opinions (*id.* at 26-27). Both of the Director's arguments are misplaced. On the contrary, it is the Director who departs from the plain meaning of "probe" as understood by a POSITA.

### A. Both Experts Agreed on the Ordinary and Customary Meaning of "Probe"

The record confirms that both Mr. Bertonis and Mr. Holobinko agreed on the ordinary and customary meaning of "probe." It is the Director, not Entropic, that misreads their testimony.

Beginning with Petitioner's expert, Mr. Bertonis was directly asked a straightforward question and gave a straightforward answer:

> Q. What was your understanding of the word "probe" that you used in your analysis in this case?
>
> A. Well, it would be the same understanding that I had of probe in general, which is used -- a signal used to assess the communications path.

Appx12468 (10:5-10). The Director does not dispute this testimony. Instead, he cites (at 27) a broader range of testimony supposedly showing an "inability by Mr. Bertonis and the questioning attorney to establish a clear understanding." An expert witness providing evasive answers to adversarial questions is hardly surprising, and it is understandable that there might be some instances of confusion across 18 pages of testimony. *See* Red Br. 27. That is not a basis for ignoring the unambiguous question-and-answer quoted above. Mr. Bertonis was offered the opportunity to ask for clarification on all questions (Appx12467, 6:21-7:10), he did not ask for clarity then, and the question (and answer) are simple and readily understood.

Regardless, the Director's characterization of Mr. Bertonis's more extensive testimony is not true. The Director relies on Mr. Bertonis's testimony that probes "could also be used for looking for users on the network in the context of probing to find users" to argue (at 27) that Entropic's construction is too narrow. *See* Appx12467 (8:2-15). But the Director fails to note important clarifications from Mr. Bertonis that followed: such an exemplary probe to "identify[] a hidden node" (i.e., user) "would still be going over the signal path," and "the node could be hidden because of problems on that signal path." Appx12470 (19:13-20:22). Such a use would still involve assessing the channel. Appx12470 (18:24-19:4). In fact, Mr. Bertonis went on to testify that *all* the various examples of probes described in the '690 patent would involve assessing (or characterizing) the channel. Appx12468 (13:12-17) (testifying that "the '690 patent has examples of – of probe in the patent, so I think they would be included in assessing network environment"); Appx12471-72 (25:18-26:10) (agreeing that "probes in the '690 patent are used 'to determine characteristics of the channel on which the signal was transmitted'"). The Director cites this same testimony and characterizes it as Mr. Bertonis "testif[ying] that the various examples of probes in the '690 patent would be included in the meaning of probe." Red Br. 27. But this misses the point of Mr. Bertonis's testimony: the probes of the '690 patent all fall within the umbrella of "signal[s] used to assess the communications path" (Appx12468 (10:5-10)), not because it is some limitation

being imported from the specification, but because it is the plain meaning of "probe" as understood by a POSITA.

The Director misinterprets the Bertonis deposition transcript as demonstrating that Mr. Bertonis's "understanding of 'the plain and ordinary meaning of probe as it's used in the '690 patent' is 'a transmission in response to a request from the node that would be receiving the probe.'" Red Br. 27. But the testimony that immediately follows shows this not to be true. Instead, Mr. Bertonis was simply reading from the '690 patent's description of *receiver determined* probes. Appx12469 (14:23-15:4); Appx103 (1:66-2:6). The '690 patent is directed to probes that are generated and transmitted in response to a request, but that is not what makes them "probes." Rather, what makes them "probes" is that they are signals or messages used to characterize or assess the communications channel or path between two nodes. Appx12470 (18:24-19:4) (Mr. Bertonis offering a "definition of probe… as used in the context of the '690 patent" as a "[s]ignal assessing… [t]he communications path of the network"). To be sure, Mr. Bertonis described various applications of probes, but none of those examples contradicted his understanding that a probe is "a signal used to assess the communications path." Appx12468 (10:5-10).

Turning to Mr. Holobinko, the Director focuses (at 27) on differences between Entropic's construction and the words Mr. Holobinko chose in his Declaration, but

Entropic addressed this discrepancy already.[1] *See* Blue Br. 15, 38. Mr. Holobinko described a probe as "a particular kind of signal or message having a form used to characterize the communication channel between the two nodes." Appx13367 (¶47). Mr. Bertonis described probes similarly, but he did not use the specific language of "having a form." Appx12468 (10:5-10); Appx12470 (18:24-19:4). Entropic omitted those three words so that it could propose a construction that is consistent with what both experts agreed was the ordinary and customary meaning of "probe."

### B. The Intrinsic Record Supports Appellant's Construction

The Director mis-frames Entropic's construction as one that attempts to "import[] a limitation from the specification" into the meaning of "probe." Red Br. 19. On the contrary, it is the Director who misuses the intrinsic record to depart from the ordinary and customary meaning of "probe" in this technical field at the time of the invention. This is improper where there is no disclaimer or lexicography present in the intrinsic record, and the Director does not identify any. The problem with the Director's approach is that the '690 patent identifies various *applications* of probes, but the definition of what a probe is would already be known to a POSITA.

[1] The Director attacks Entropic's plain explanation as "conclusory" and "without supportive reasoning or explanation." Red Br. 27. Yet the Director does not offer any further explanation and only generically cites three paragraphs of Mr. Holobinko's declaration. *Id*. The Court should not credit the Director's broad, unsupported assertions. *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("an argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived").

Blue Br. 35. And that ordinary and customary meaning is apparent from a review of the intrinsic record as a whole.

*1. The Independent Claims Support Entropic's Construction*

The Director points out (at 20) that the independent claims do not recite the words "characterize," "assess," or "channel," and while that is true, it misses the point. The claim language does not set out to redefine the term "probe" because a POSITA would already be familiar with the ordinary and customary meaning of that term. Rather, the claim language recites novel ways of requesting and generating probes based, among other things, on what parameters the requester wants the probe to have. That is why the Director's reliance (at 20-21) on the requirements in claims 1, 9, and 17 of specifying various parameters of the claimed probes does not support the Board's construction or the Director's arguments.

The "content payload" in claim 1 and the "modulation profile" in claims 9 and 17 are two parameters that can be specified by the probe request. Appx96 (title); Appx103 (2:3-18) (describing how the probe request "specifies a plurality of parameters to be used in such a 'receiver determined,'" including e.g. content payload and/or modulation profile). What distinguishes the '690 patent over the prior art is not that its probes have a "content payload" or a "modulation profile," but that these parameters can be dictated by the probe request. *Compare* Appx103 (1:48-62) (describing prior art "predetermined" probes) *with* Appx103 (1:66-2:19)

(describing the novel "receiver determined" probes of the '690 patent); *see also* Appx96 (title); Appx13364-65 (¶¶ 40-41). Importantly, the Director fails to address that the claims recite "probes," not broader terms like "signal" or "message." *See* Appx12469 (17:24-25) (Mr. Bertonis agreeing that not all messages are probes).

*2. The Dependent Claims Support Appellant's Construction*

The Director next argues (at 21) that dependent claims 7 and 13 "confirm the broad scope of 'probe' in the independent claims." But the Director does not address Entropic's arguments (Blue Br. 36-37) detailing that "diagnosing a network problem" (claim 7) and "identifies a hidden node" (claim 13) recite specific *applications* of the receiver determined probes described in the patent. The Director also has no answer to Mr. Bertonis's testimony equating "diagnosing" with "assessing" (Appx13414 (191:13-23), Appx13415 (194:1-12)), explaining that "identifying a hidden node [] would still be going over the signal path" and that "the node could be hidden because of problems on that signal path" (Appx12470 (20:6-22)), or admitting that the example probes in the '690 patent "would be included in assessing network environment" (Appx12468 (13:12-17)). And the Director has no answer to the specification (*e.g.*, Appx104 (4:34-38)) where the '690 patent describes identifying a hidden node as an example of diagnosing a network problem. Instead, the Director disagrees in conclusory fashion that Entropic's position "is

based on [a] misreading of the specification." Red Br. 21. The Court should not credit the Director's conclusory assertions.

There also is no merit to the Director's conclusory arguments (at 21) that the dependent claims "indicat[e] a broader range of purposes for probes than characterizing a channel." Even if "network problems" are not limited to issues with the channel (Red Br. 21), at least some are, so using a probe to diagnose those problems is consistent with the claim language. Appx12470 (20:21-22) ("node could be hidden because of problems on that signal path"), Appx12476 (43:14-44:3) (listing examples of network problems), Appx12477 (46:8-14); *see also* Appx104 (4:34-38) (using a probe to replicate a diagnosable problem). Claim 7 does not recite that the "probe assists in diagnosing *all* network problems," but merely "*a* network problem." Whether or not a probe can diagnose all network problems is therefore irrelevant—or at least does not change the ordinary and customary meaning of "probe." The same is true for the Director's conclusory arguments as to "identifies a hidden node" and claim 13; in Mr. Bertonis's words, "identifying a hidden node [] would still be going over the signal path," and "the node could be hidden because of problems on that signal path." Appx12470 (20:6-22).

### *3. The Specification Supports Entropic's Construction*

The Director correctly acknowledges the distinction between "[i]nterpreting what is *meant* by a word *in* a claim" and "adding an extraneous limitation appearing

in the specification, which is improper." Red Br. 24 (citing *Cruciferous Sprout*, 301 F.3d at 1348). Yet Entropic's construction is borne of the former, not the latter. *See* Blue Br. 29-32. The Director fails to appreciate that Entropic's construction *is* the ordinary and customary meaning of "probe" and is not based on importing limitations from the specification.

The Director first argues that the specification describes how only "*some* embodiments relate to channel assessment probes" (Red Br. 21) and that the specification "differentiates between probes for diagnostic use, probes for network maintenance, and probes for channel assessment" (Red Br. 23-24), both of which the Director argues imply that not all probes are used for channel assessment. But even if diagnostic use and network maintenance are somehow distinct from channel assessment, Entropic's construction is not limited to channel assessment; it allows for a probe to be used for channel assessment *or channel characterization*. *See* Blue Br. 19, 29-30; Appx103 (1:48-52) ("In some instances, probes are sent between nodes of the network in order to allow a receiving node on the network to determine some of the characteristics of the channel between the receiving node and the transmitting node"); *see also* Appx12472 (26:5-10) (Mr. Bertonis agreeing that probes in the '690 patent are generally used to determine characteristics of the channel on which the signal was transmitted).

Regardless, Entropic already detailed how the "diagnostic use" and "network maintenance" applications of probes fall within Entropic's construction, and the Director provides no response to that. *See* Blue Br. 29-32. For example, Entropic explained (*id.* at 30) how the '690 patent describes using probes to "profile the channel conditions" and "diagnose problems." As another example, Entropic explained (*id.* at 31) how the probes of the '690 patent "can be used to profile the channel conditions," which is the same as assessing or characterizing the channel. *See also* Blue Br. 32 (explaining how "these exemplary probes are also related to characterization or assessment of the communications channel"). The Director's citations (at 23-24) to Appx106 (8:43-47) and Appx107 (9:44-47) are unavailing. For example, Appx106 (8:43-47) describes preambles available for probe *requests*. There is nothing to suggest that a probe used for channel assessment cannot also be used for diagnosis or network maintenance. Similarly, Appx107 (9:44-47) states only that repeating a probe can allow for improved channel assessment or diagnosing particular kinds of network issues. It does not suggest there is some sharp division between "channel assessment" and "diagnostic" probes.

The Director next argues (at 22) that certain examples in the specification "unmistakably identif[y] uses for probes well beyond helping to characterize or assess the channel between two network nodes." Yet again, the Director provides only that conclusory disagreement and does not otherwise cite support or explain

why his position is correct. The Court should not credit this bare disagreement in comparison to Entropic's detailed explanations (*see* Blue Br. 29-32).

The Director further argues that there is no reason why replicating network problems, discovering hidden nodes, or performing network admission must necessarily involve characterizing or assessing the channel. Red Br. 22. But saying that a probe can be used for *x*, *y*, or *z* does not mean that every means of performing *x*, *y*, or *z* must fit the definition of a probe. The specification describes exemplary applications of a probe's channel assessment or characterization. Appx104 (4:34-38) (referring to these as examples of how "network probes can be used to diagnose problems"); Appx12468 (13:12-17) (explaining that the '690 patent's examples would be included in assessing the channel); Appx12470 (20:6-22) (explaining how a node could be "hidden" because of problems with the channel); *see also* Appx12472 (26:5-10). The Director has not shown that any of these potential applications is inconsistent with Entropic's construction.

Finally, the Director points (at 22-23) to the disclosure that "probes may be used in a variety of applications," including "OFDMA sub-channel assessment" and "reach[ing] or discover[ing] hidden nodes," as suggesting that these are distinct applications that fall outside of Entropic's construction. Again, however, these are disclosures of possible applications of a probe—and Entropic explained how these applications still fall within a characterization, or assessment, of the channel. *See*

Blue Br. 29, 30-32, 35. Regardless, the Director has not shown that these applications are somehow incompatible with Entropic's construction.

### C. The Proper Remedy Is Reversal, Not Remand

Under the correct construction, the record lacks substantial evidence to support any finding of unpatentability under WiMAX or DOCSIS-2.0 because neither disclose a "probe." Blue Br. 40-43. Reversal is therefore the appropriate remedy. *See Personalized Media Communications v. Apple Inc.*, 952 F.3d 1336, 1346 (Fed. Cir. 2020). The Director disagrees (at 28) but offers no evidence or analysis rebutting the lack of substantial evidence to support a finding of unpatentability under the correct construction. Reversal is therefore appropriate.

## II. EVEN UNDER THE BOARD'S CONSTRUCTION, THE BOARD VIOLATED THE APA

### A. Entropic Did Not Forfeit This Issue for Appeal

The Director's lead response to Entropic's APA argument is that Entropic supposedly "forfeited any argument that WiMAX and DOCSIS 2.0 do not teach a 'probe' under the construction that [Petitioner] urged and the Board ultimately adopted." Red Br. 30. That argument is wrong for several reasons.

*First*, the Director's forfeiture argument is premised on an incorrect belief that "all of Entropic's arguments that WiMAX and DOCSIS 2.0 do not teach a 'probe' relied on its improper claim construction." Red Br. 30 (citing Appx21).

While Entropic made some arguments against the prior art based on its construction, throughout the proceeding, Entropic *also* objected to Petitioner's failure to explain the "plain meaning" construction of "probe" it invoked.

- In its Preliminary Response, Entropic distinguished the ranging messages in the prior art from the claimed probes, describing WiMAX's ranging procedure as "no more than a message exchange between network nodes to negotiate communication protocols and parameters between them." Appx271; *see also* Appx259-260. The distinction was concrete: identifying a message that negotiates communication parameters does not itself establish that the message is a "probe." Indeed, Entropic's objection that Petitioner treated "probe" as "a nonce word essentially having no meaning" appears in the very preliminary response the Director invokes (Appx260; *see* Red Br. 29), which the Board acknowledged at Institution (Appx322).
- In its Patent Owner Response, Entropic explained that a "'probe' is not just any message" and objected that Petitioner treated "probe" as if it simply meant "message." Appx398-399. Entropic also challenged the diagnostic function Petitioner provided to support its probe allegation, explaining that, "more to the point," the theory rested on "conjecture and what *could have been possible* rather than what the prior art actually teaches." Appx449 (emphasis in original). Even if a broader meaning of "probe" encompasses modem

diagnosis, that does not answer Entropic's objection that Petitioner had not established the asserted diagnostic function.

- Entropic sharpened the distinction between the overall ranging process and the particular messages Petitioner identified as probes in its Sur-Reply. Entropic objected that Petitioner's "vague and incoherent definition" offered no "guideposts" (Appx521-522, *see* Appx19-20), and argued that messages merely exchanging parameters or "communicating information" (like those in WiMAX and DOCSIS 2.0 are not probes, "even where the signals or messages contain a CID or have identical parameters" (Appx522-523, *see also* Appx411, Appx417). Under the heading "Merely Exchanging Parameters Is Not Probing," Entropic explained that "[p]assing parameters is not a technical analysis or diagnosis" and distinguished messages conveying "communication information" from probes. Appx522-523. For WiMAX specifically, Entropic objected that Petitioner had shifted from the identified RNG-REQ and RNG-RSP messages to "the entire ranging process," while leaving "[a]bsent … any discussion of using the RNG-REQ and RNG-RSP messages in those processes." Appx523-524.
- Finally, at the oral hearing, Entropic expressly addressed Petitioner's showing under a broader meaning. Focusing on WiMAX's and DOCSIS-2.0's ranging messages, Entropic argued that "*to the extent that there is a plain and ordinary*

*meaning* … that would just collect all of the examples and say it's one of these things, *Petitioner still can't meet its burden by showing that a ranging message is a probe*." Appx606 (34:8-14) (emphasis added). Counsel for Entropic further identified the deficiency: the cited messages "just pass or negotiate communication parameters," and "[s]ending parameters alone does not make a message a probe." Appx606 (34:17-20).

*Second*, the pages the Director cites confirm there was no forfeiture. Red Br. 30 (citing Appx446-450). There, Entropic argued that DOCSIS-2.0 discloses no use for its test transmission—which is sent only "in response to an explicit command from the operator" (Appx1850)—and that Petitioner's expert could only presume that the signal was analyzed. Appx446-450. Indeed, Mr. Bertonis testified that "presumably, the cable modem is analyzing that test signal," and conceded that what the CMTS does with it "may not be disclosed." Appx12495 (119:14-18); Appx12496 (122:3-7). That is a challenge to the sufficiency of Petitioner's evidence and the need to explain how or why DOCSIS 2.0 discloses a "probe" even where the construction is said to take its "plain and ordinary meaning." The Board nevertheless declared DOCSIS-2.0's test transmission a "probe" "under its plain meaning," without explaining what makes that transmission a probe rather than merely a signal or message. Appx68.

*Third*, even if Entropic had not preserved a challenge to the prior art's disclosure of a "probe" that did not rely on its construction being adopted, there also can be no forfeiture because the APA defect arises from the Final Written Decision itself, and Entropic raised it at its first opportunity. Blue Br. 43-49. The Board did not "specify" any different plain meaning for "probe," as it said it would where necessary (Appx24). It rejected Entropic's arguments only by rejecting its construction (Appx28), and it never stated a meaning under which a message exchanging timing and power parameters is a probe. Entropic cannot have forfeited arguments under a meaning that neither Petitioner nor the Board ever articulated.

*Finally*, the Director's position appears to be that Entropic's purported forfeiture of technical arguments about prior art before the Board somehow lessens the Board's freestanding obligation to adequately support its decision. Red Br. 30-31. That reasoning is incorrect as a matter of law because the burden of proving unpatentability rests with petitioners and never shifts to a patent owner. 35 U.S.C. § 316(e); Blue Br. 48. "[A] patent owner carries no obligation to raise any objection to the petitioner's challenges at all." *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1342 (Fed. Cir. 2020). Entropic does not seek to introduce an unpreserved technical theory; rather it relies on the objections it actually presented and raises the Board's plain failure to satisfy its obligations under the APA. The Court certainly can address that issue on appeal.

### B. Rejecting Entropic's Construction Is Not an Explanation of What a "Probe" Is or Why the Cited References Disclose a "Probe"

The Director argues (at 29) that, having rejected Entropic's arguments and found Petitioner's contentions persuasive, the Board "did all that it needed to do." But "it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument." *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). The Board needed to, but failed to, explain what it understood a "probe" to be or how the prior art met that construction. The Director tries to confine *NuVasive* to motivation to combine findings and to arguments the Board ignored. Red Br. 31-32. But the Board is equally obligated under the APA to explain its findings that the prior art teaches a claim element. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123-24 (Fed. Cir. 2022).

The Director is also incorrect to argue (at 32) that Entropic "identifies no pertinent argument it made that the Board failed to address"—a minor variation on the Director's "forfeiture" argument above, and no more valid. Entropic's Blue Brief specifically challenged the Board's failure to adequately explain why WiMAX's Ranging Response and DOCSIS-2.0's Test Response qualify as probes under the meaning the Board applied. Blue Br. 44-46. The Board recognized Entropic's argument that ranging is "no more than a message exchange between network nodes to negotiate communication protocols and parameters between them" and does not characterize the channel (Appx27-28) but answered only the latter

(Appx28). And the Board's agreement with the Petition (Appx30) adds nothing here. The Petition itself labeled the Ranging Response a "probe" by parenthetical, describing ranging only as a procedure "used to acquire correct transmission parameters and maintain the RF link's quality." Appx134; *see* Blue Br. 47. That describes what ranging does; it does not explain why a message conveying only transmission parameters is a "probe."

*Provisur*, cited by the Director (at 31), is instructive. There, the Court held that the Board's description of the prior art reference in question could not excuse the Board's failure to provide reasoning to support its findings as to why that reference was a basis for unpatentability: "That the Board understood Whitehouse's disclosure does not show how the Board thought that it (or anything else) rendered obvious the surface-area limitations, even if Weber relied on some of the cited excerpts in its petition in making its surface-area-limitation arguments." 50 F.4th at 124. The Court vacated. *Id.* The Director makes the same move here. He says (at 31) that the Board "clearly identified the evidence it found sufficient," citing Appx26-27, Appx29-30, and Appx66-68. Pages Appx26-27 are the Board's overview of WiMAX, describing ranging as acquiring "transmission parameters . . . so that a BS and an SS can communicate." Appx26. Pages Appx29-30 contain the parenthetical "Ranging Response ('probe')." Page Appx68 states that DOCSIS-2.0's test transmission "is a 'probe' under its plain meaning." And elsewhere,

addressing the "physical layer" requirement of claim 9, the Board stated that the Ranging Response "is transmitted over the PHY layer . . . and is used to determine timing and power for transmissions." Appx35. None of these explains what makes a ranging response or a test transmission a "probe," or distinguishes probing from communicating parameters—the line Entropic drew. Appx411; Appx417; Appx522-523; Appx606. Even Petitioner's expert agreed that "most messages are not probes," and that packets containing "some identical parameters" are still not probes because such a packet is "not in and of itself doing probing." Appx13421 (218:18-19, 220:5-11). So what makes the messages and signals of WiMAX and DOCSIS 2.0 "probes"? The Board never said.

The Director seeks to distinguish *Securus Technologies, Inc. v. Global Tel*Link Corp.*, 685 F. App'x 979 (Fed. Cir. 2017) (nonprecedential) because it cites *In re Sang Su Lee*, 277 F.3d 1338 (Fed. Cir. 2002), and because the Director claims that *Sang Su Lee* is distinguishable because it related to a contested claim element. Red Br. 32-33. But that argument is a straw man.

The Court's citation in *Securus* to *Sang Su Lee* does not limit the reasoning of *Securus* to the facts of *Sang Su Lee*. In fact, while the Director argues that *Securus* did not identify the claim elements at issue as uncontested, Red Br. 32, those elements were indeed uncontested by the patent owner. *Compare Glob. Tel*link Corp. v. Securus Technologies, Inc.*, No. IPR2014-01278, 2016 WL 783391, at *9,

*13 (P.T.A.B. Jan. 21, 2016) (patent owner did not independently argue against claims 3, 8, 14, 24, 25, 27-30, and 31) *with Securus*, 685 F. App'x at 987 (finding an APA violation as to the Board's decision on claims 3, 8, 14, 24, 25, 27-30, and 31 because the Board "failed to articulate any reason supporting its decision"). Yet the Court *still* found an APA violation. *Id.* That is the critical takeaway from *Securus* that the Director seeks to avoid: the Board's APA obligations attach regardless of what patent owner argues to the Board. Here, moreover, Entropic did present the objections discussed below. And the Director's assertion (at 32-33) that the Board decided every contested issue does not answer whether the Board adequately explained those decisions.

The Director's attempt (at 32) to distinguish *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575 (Fed. Cir. 2016) (nonprecedential), another decision with facts in line with those here, also falls short. The Director concludes that *Cutsforth* "is not the situation here," Red Br. 32, but says so without analysis and does nothing to rebut Entropic's showing how this case parallels that in *Cutsforth*. Blue Br. 48-49. In short, the Board's decision here relies on the same "broad, conclusory statements" to find the challenged claims unpatentable as the Court found improper in *Cutsforth*. 636 F. App'x at 578; Blue Br. 43-49; *see* Appx21.

The Director also relies on *Ariosa's* statement that the Court may affirm if it "may reasonably discern" the Board's path. Red Br. 31. But *Ariosa*, in the same

paragraph, cautions that the Court must not itself "make factual and discretionary determinations that are for the agency to make." *Ariosa Diagnostics v. Verinata Health*, *Inc*., 805 F.3d 1359, 1365 (Fed. Cir. 2015). The Court vacated even where "[p]erhaps the Board could have" made the necessary determinations, but the critical fact was that "it did not, and [the Court] cannot do so for the Board where, as here, the matter is not purely legal." *Id*. at 1366. The same problem exists here. For WiMAX, the Director cites passages from the Board's Decision describing the ranging procedure and identifying the Ranging Response as the claimed probe (Red Br. 31 (citing Appx26-27)), but the Director cannot cite any passages that explain why the Ranging Response qualifies as a probe because the Board never said why. *See* Blue Br. 44-45. For DOCSIS-2.0, the Director cites passages describing the testing procedure and declaring the Test Response a probe "when given its plain and ordinary meaning" (Red Br. 31 (citing Appx66-68)), but none of those passages explain what makes the Test Response a probe—and that is the failing in the Board's Decision. *See* Blue Br. 45-46.

## III. THE BOARD ERRED IN ITS ANALYSIS AND CONSTRUCTION OF THE "SPECIFY … CONTENT PAYLOAD" REQUIREMENT

### A. Footnote 12 Resolves Claim Scope, and That Legal Determination Receives *De Novo* Review

The Director does not dispute the proper construction of "specify" (Blue Br. 49-51), and the Director does not dispute that under a correct construction of

"specify," the Court should reverse (Blue Br. 55-57). The Director only disputes whether the Board engaged in claim construction, calling Entropic's construction challenge a "straw man" because (1) neither party requested a construction of "specify," (2) the Board did not address the term in its claim construction section, (3) footnote 12 did not expressly depart from plain and ordinary meaning, (4) footnote 12 resolved a concern about the prior art from its Institution Decision, and (5) footnote 12 does not suggest that "the 'causation' component of 'specify'" does not apply. Red Br. 33-35. But the Director's observations and argument do not hold up against the Court's precedent and do not answer the governing question: whether the Board engaged in or applied a particular construction of the claim language. The Board did, and the Court should reverse.

1. The absence of a formally requested construction does not foreclose review of the interpretation the Board actually adopted. *See* Blue Br. 52-54; *see also*, *e.g.*, *Metrom Rail, LLC v. Siemens Mobility, Inc.*, No. 24-2223, 2026 WL 1295229, at *6 (Fed. Cir. May 11, 2026) (nonprecedential). Entropic explained why the Court's decisions permit review here (Blue Br. 52-54), yet the Director addresses none of them. Instead, the Director relies on *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356 (Fed. Cir. 2016) and *In re Urbanski*, 809 F.3d 1237 (Fed. Cir. 2016), but neither address what the Board did here. In *Harmonic*, the Board expressly construed "predefined period of time," and the Court assessed whether the petitioner

sufficiently explained how the cited reference disclosed that requirement. 815 F.3d at 1362-64. In *Urbanski*, the Court reviewed findings concerning motivation to combine, expected results, and teaching away, not whether the Board engaged in implicit or explicit claim construction. 809 F.3d at 1241-44. Both decisions review factual findings about prior art teachings under the substantial evidence standard; neither decision addresses whether and when the Board's reasoning constitutes an implicit claim construction.

2. The Board's characterization of its analysis or the location of that analysis in its Decision is not dispositive of whether construction occurred. *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1055-56 (Fed. Cir. 2024). The proper inquiry concerns the substance of the determination, not its location or label. *Id.* Moreover, as the Court explained in *HTC*, "Board findings establishing the scope of the patented subject matter may fall within the ambit of claim construction" even without an express construction. *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). Such is the case here.

The Court's decision in *EcoFactor* is particularly instructive here. In *EcoFactor*, the Board determined whether separately recited inputs could be based on one another or instead had to remain distinct. 92 F.4th at 1055-56. The Court found that that determination established the permissible relationship among the claimed inputs and therefore constituted claim construction, even though the Board

stated that "no express construction" was necessary. *Id.* at 1055-56. Here, the Board likewise resolved a question of permissible relationship under the claim language: whether the request CID may "specify itself" in the response payload. The Board reached that conclusion through "further study of the claim language," reasoning that "there is no limitation to preclude this possibility." Appx29 n.12. That reasoning determines what "specify" permits under the claim language, not merely what WiMAX discloses. It is therefore a determination of claim scope, not a factual finding about the prior art.

3. The fact that footnote 12 does not expressly depart from "plain and ordinary meaning" does not demonstrate a lack of claim construction by the Board. Initially, the Board did indeed depart from the "plain and ordinary" meaning of "specify" for the reasons detailed in Entropic's Blue Brief (at 49-51), regardless of whether it explicitly stated a departure from it. Further, a claim interpretation does not cease to be claim construction simply because the Board regards its interpretation as the term's ordinary meaning. The question is whether the Board's reasoning establishes the claim's scope, not whether the Board labels its interpretation an express construction. *EcoFactor*, 92 F.4th at 1055-56.

4. The fact that footnote 12 seemingly resolved a "concern[]" that the Board had "[i]n the Institution Decision" (Appx29) does not make the Board's resolution of that concern merely factual. Indeed, the Board explicitly says that it

resolved its concern by "further study of the claim language"—which is exactly what claim construction is. Appx29 n.12. Even more fundamentally, though, claim construction may occur "in tandem with" comparison to the prior art. *EcoFactor*, 92 F.4th at 1055. The Board's resolution of a prior art dispute through an interpretation of what the claim permits remains a determination of claim scope.

5. That footnote 12 does not expressly declare causation unnecessary misses Entropic's challenge. Entropic's argument here is not related to the detail provided by the Board in its Decision or the words it used to describe its construction. Instead, Entropic's argument is that the Board's interpretation is wrong and contrary to the ordinary and customary meaning of "specify." Entropic disputed that "specify" in the '690 Patent would permit equal values to specify each other (or "itself" as the Board put it). Blue Br. 54 (citing Appx529-530). The Board answered that the claim did not preclude the first plurality of parameters (e.g., WiMAX's CID) from "specify[ing] itself." Appx29 n. 12. Whether matching values, without more, satisfy "specify content payload" is the claim scope question that the Director's characterization of the dispute as "factual" leaves unanswered.

### B. Even Under Substantial Evidence Review, the Cited Disclosures Do Not Establish That the Request Parameters "Specify Content Payload"

After "further study of the claim language," the Board concluded that "there is no limitation to preclude" the first plurality of parameters in the probe request (the

CID in WiMAX's Ranging Request MAC header) from "specify[ing] itself" as the content payload of the probe (WiMAX's Ranging Response's TLV information). Appx29 n.12. According to the Board, then, the *value* of the CID in the Ranging Request MAC header dictates the *same value* be in the CID in the Ranging Response's TLV information—it "specifies itself." Yet the Director does not defend the Board's reasoning on its own terms.

The Director instead attempts to defend the Board's Decision by relying on a different argument: that an initialization request requires inclusion of certain data fields in the Ranging Response message containing separately assigned identifiers. Red Br. 37. This is nowhere to be found in the Board's Decision, which was concerned solely with *values* not with the inclusion of *data fields*. Further proving that the Director's argument has no basis in the record below, it also appears nowhere in Petitioner's arguments or papers, which clearly state that Petitioner was relying on the *values* of the CIDs, not the inclusion of the CID *data fields* themselves. *See* Appx139-Appx141; Appx478 ("The Basic CID in the TLV information of the Ranging *Response* would have had the *same value* as the CID in the Ranging *Request*") (emphasis on "same value" added). The Director's reliance (at 37) on Mr. Bertonis's Reply Paragraph 38 is also misplaced, as in that Paragraph, Mr. Bertonis explicitly makes a value-based argument, not the new data-field-based argument presented by the Director. Appx9794 ("Under this interpretation, limitation 1A

would have been met at least when a CID in an initial Ranging Request is set to a default value (e.g., zero), which would have caused the BS to generate the Ranging Response with TLV information having the Basic CID equal to some 16 bit value.").

The Director's new rationale cannot substitute for or save the Board's actual reasoning. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015); *Kaken Pharm. Co., Ltd. v. Iancu*, 952 F.3d 1346, 1355 (Fed. Cir. 2020). Review is confined to "the grounds upon which the Board actually relied," not appellate counsel's *post hoc* rationalization. *Power Integrations*, 797 F.3d at 1326; *see also Calcutt v. FDIC*, 598 U.S. 623, 624-25 (2023) (reversing where the reviewing court affirmed agency action based on "a legal rationale different from the one adopted" by the agency); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (judicial review is limited to "the grounds that the agency invoked when it took the action"); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action."). The fact that the Director pivots to a different argument to save the Board's Decision highlights the lack of substantial evidence in the record to support the Board's findings and reasoning.

Two ancillary arguments by the Director remain, both of which fail. *First*, the Director misstates Entropic's argument, describing it as one that requires the request to specify the "exact value" of the identifier. Red Br. 37-38. What Entropic

instead argues across is that there is no "specify[ing]" in WiMAX because (1) the BS has autonomy to change the CID value and therefore the fact of receiving a specific CID value does not specify that the BS need to use that received CID value; and (2) the Ranging Request asks for a Basic CID value of any sort—which the WiMAX standard permits to be literally any 16-bit value. *See* Blue Br. 56-57. To be clear: Entropic does not argue that "specify" is limited to situations where the *exact* payload content is dictated, but the request must at least specify *something* about what the payload content need be.

*Second*, the Director's job offer analogy (at 38) illustrates the Director's (and the Board's) misunderstanding of the claims and highlights Entropic's point. A job offer requiring a response within one week "does not specify the content of the response (yes or no)" (Red Br. 38) yet the claims require "specify content payload of the probe" response—not simply "specify a response." The Director's analogy is simply inapplicable to the claim language here.

## CONCLUSION

The Court should reverse the Board's unpatentability findings for all claims on appeal. The Board's construction of "probe" departs from the ordinary and customary meaning agreed by both experts and supported by the intrinsic record, and under the correct construction neither WiMAX nor DOCSIS-2.0 discloses the claimed probe. The Board further erred when it found that WiMAX's Ranging

Request "specifies" the content payload of the Ranging Response by reference to a "CID specifying itself" rationale that eliminates any causal or definitional relationship between request parameters and probe content—the very relationship the claim requires. At minimum, because the Board's decision consists of parenthetical labels and bare conclusions that do not explain why the prior art meets the claims under any definition of "probe" the Board actually articulated, the Court should vacate and remand for the reasoned analysis the APA demands.

Respectfully submitted,

Dated: November 12, 2026

*/s/ Vincent J. Galluzzo*

Jason A. Engel
Vincent J. Galluzzo
Ryan P. Regan
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
E-mail: jason.engel@klgates.com
vincent.galluzzo@klgates.com
ryan.regan@klgates.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Circuit Rule 32(b) because this brief contains 6,957 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point Times New Roman font.

Dated: November 12, 2026

By: */s/ Vincent J. Galluzzo*
Vincent J. Galluzzo